**Sharon Raedelle WOLFORD,**
**Petitioner,**

v.

**UNITED STATES of America,**
**Respondent.**

**Civil Action No. 1:09cv723.**
**Criminal No. 1:06cr113.**

United States District Court,
E.D. Virginia,
Alexandria Division.

July 2, 2010.

Sharon Raedelle Wolford, pro se.

## MEMORANDUM OPINION

T.S. ELLIS, III, District Judge.

Following a six-day jury trial,[1] petitioner, Sharon Raedelle Wolford ("Wolford"), was convicted of one count of conspiracy to distribute oxycodone and other controlled substances within 1,000 feet of an elementary school, in violation of 21 U.S.C. §§ 841(a), 846 and 860, and two substantive counts of distributing oxycodone, in violation of 21 U.S.C. § 841(a). She was ultimately sentenced to concurrent terms of imprisonment of 108 months as to each of the three counts of conviction—a significant downward variance from the applicable guidelines range of imprisonment of 360 months to life.

Now at issue is Wolford's motion to vacate, set aside or correct her convictions and sentence, pursuant to 28 U.S.C. § 2255, based primarily on the alleged ineffective assistance of her appointed counsel in the plea negotiation and pretrial proceedings. Counsel for both Wolford and the government have fully briefed the issues raised in the instant motion and an evidentiary hearing was held in accordance with § 2255(b), which provides that "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall ... grant a prompt hearing thereon...." 28 U.S.C. § 2255(b). Oral argument was heard in the course of the evidentiary hearing and additional oral argument is unnecessary as the facts and legal contentions are adequately set forth in the existing record.

## I.

Resolution of the questions presented requires a detailed, chronological summary of the pertinent facts and procedural history.[2]

This prosecution was initiated on February 22, 2006, with the issuance of a federal criminal complaint charging Wolford with one count of conspiracy to distribute cocaine, oxycodone, dextroamphetamine and methadone in the Eastern District of Virginia, in violation of 21 U.S.C. §§ 841(a)(1) and 846. The criminal complaint also charged several alleged co-conspirators, including (i) Wolford's son, Christopher Wolford, and (ii) Wolford's former live-in

---

1. Senior District Judge Leonard D. Wexler, Eastern District of New York, sitting by designation, presided over all proceedings in this case in the district court, including the trial and sentencing.

2. This recitation of facts is derived from the record as a whole, including (i) the trial record, (ii) the testimony and evidence presented in the course of the October 9, 2009 evidentiary hearing and (iii) the certified payment voucher submitted by Wolford's appointed counsel at the conclusion of the proceedings, pursuant to the Criminal Justice Act ("CJA"), 18 U.S.C. § 3006A, recording the time he devoted to the various tasks undertaken in the course of his representation of Wolford. Credibility assessments are made where the parties' affidavits and sworn testimony differ on any material issue.

boyfriend, William McCauley.[3] In essence, the criminal complaint charged Wolford and her alleged co-conspirators with operating a lengthy drug distribution enterprise—from 2001 to 2006—out of Wolford's primary residence, which was located within 1,000 feet of an elementary school in Manassas, Virginia. The majority of the controlled substances involved in the charged conspiracy were pain medications obtained by Wolford and McCauley through the use of physician-issued medical prescriptions. And, although many of these controlled substances were indeed distributed or sold to others, or traded with others in exchange for different types of drugs, the record reflects that significant quantities of the controlled substances were also used personally by Wolford and McCauley, as both were addicted to prescription pain killers.

Wolford was arrested on the criminal complaint on February 23, 2006, and her residence was searched pursuant to a search warrant later that day. In the course of the search, federal agents seized, *inter alia*, (i) nearly one hundred empty prescription bottles for various controlled substances that had been prescribed to Wolford, McCauley and other unindicted co-conspirators, totaling more than 8,000 pills, (ii) drug measuring devices, (iii) syringes, spoons and drug pipes with suspected drug residue, and (iv) handwritten drug transaction logs.

On February 24, 2006—the day after Wolford's arrest—Alfred Lincoln Robertson, Jr., Esq. (hereinafter "trial counsel") was appointed to represent Wolford in this matter pursuant to the CJA, 18 U.S.C. § 3006A. In the days immediately following his appointment, but prior to meeting personally with Wolford, trial counsel (i) researched Wolford's criminal record and

background, (ii) researched developments in the law related to the case, (iii) spoke with government counsel regarding the charged conduct, and (iv) reviewed the criminal complaint and supporting affidavit. *See* Trial Counsel's CJA Voucher (Doc. 104, Ex. C) (hereinafter "CJA Voucher"). Trial counsel then met with Wolford on February 28, 2006, to discuss the facts of the case and "strategy." *Id.* A detention hearing was also held on February 28, 2006, at the conclusion of which Wolford was released on certain conditions, including the special condition—requested jointly by trial counsel and government counsel—that Wolford attend a Phoenix House 90–day inpatient drug treatment program. The matter was thus scheduled for a status conference on May 23, 2006, following Wolford's anticipated release from the Phoenix House program.

While Wolford was at the Phoenix House, trial counsel continued to engage in case-related discussions with government counsel and the assigned law enforcement agents. In this regard, trial counsel held a meeting with the case agents and government counsel on March 7, 2006, to discuss the facts of the case and the charged conduct. *See* CJA Voucher. The record also reflects that the government extended its first written plea offer to Wolford on that date. Specifically, in a letter addressed to trial counsel dated March 7, 2006, the government proposed that Wolford plead guilty to two offenses, namely (i) one count of conspiracy to distribute controlled substances, in violation of 21 U.S.C. § 846, with a projected guidelines base offense level of 28 to 30 based on drug quantity, and (ii) one count of health care fraud, in violation of 18 U.S.C. § 1347. *See* Gov't Ex. 1 to Oct. 9, 2009 Hr'g. In return for Wolford's plea of guilty to these two

---

**3.** Also charged in the criminal complaint was Michael Roy Weidner, an alleged co-conspir-ator and supplier. Facts related to Weidner are not pertinent to the issues presented here.

charges, the government agreed in the March 7, 2006 letter that it would not charge Wolford for engaging in criminal conduct in a protected area—the elementary school located within 1,000 feet of her residence—and that it would not seek any additional adjustments or enhancements to her offense level related to "gun, role, or juveniles." *Id.*[4]

Trial counsel received and reviewed the government's March 7, 2006 letter, and while he does not specifically recall discussing that particular plea offer with Wolford, he testified that it was his usual practice in 2006, as it has been throughout his entire legal practice, "to tell clients of every plea offer." *See* Oct. 9, 2009 Hr'g Tr. (hereinafter "Tr.") at 154. Trial counsel further noted that "[e]very offer made in any type of case, I've always reported to a client what the basic outlines and basic terms were." *Id.*[5] Trial counsel's certified voucher includes an entry listed as "review proposed plea agreement" on March 7, 2006, but no additional entry is included around this time period reflecting that trial counsel disclosed or discussed the March 7, 2006 plea offer with Wolford. *See* CJA Voucher. Instead, the voucher reflects that trial counsel first contacted the Phoenix House on March 9, 2006, in an effort to ascertain the proper procedures for contacting Wolford during her participation in the inpatient drug treatment program, but that he did not speak personally with Wolford on that date. *Id.* Wolford, for her part, likewise does not remember "anyone" telling her about a plea offer extended by the government in March 2006. Tr. at 24.[6]

Between mid-March and late April 2006, trial counsel did not perform any substantive work in connection with this case with the exception of engaging in several telephone discussions with government counsel and with Wolford concerning an extension of the indictment period. *See* CJA Voucher. In this regard, the record reflects that during Wolford's stay at the Phoenix House, the government filed two motions, pursuant to 18 U.S.C. § 3161(h), to extend the time for filing an indictment beyond the otherwise applicable Speedy Trial Act deadline based on the fact that the parties were engaged in ongoing plea negotiations. Both motions for an extension of the indictment period were granted, the first on March 29 and the second on April 30, 2006. *United States v. Wolford*, 1:06cr113 (E.D.Va. Mar. 29 and Apr. 30, 2006) (Orders).

Approximately two weeks prior to her completion of the Phoenix House program, Wolford appeared, with trial counsel, at a May 23, 2006 status conference. Tr. at 24. In the course of that hearing, the government submitted yet another consent motion, pursuant to 18 U.S.C. § 3161(h), to extend the time for filing an indictment based on the parties' ongoing plea negotiations. This third motion, like the previous motions, was granted, thereby extending the indictment period until June 29, 2006.

---

**4.** It appears from the record that the government's reference to a possible firearm enhancement related to "an old black powder rifle found in one of the searches" of Wolford's residence. *See* Oct. 9, 2009 Hr'g Tr. at 156.

**5.** Trial counsel also recalls discussing with Wolford the issue of health care fraud which as it happens, was only raised in the government's March 7, 2006 plea offer. Tr. at 155, 167. Indeed, such an offense was neither

included in any of the government's subsequent plea offers, nor charged in the eventual indictment or superseding indictment.

**6.** The question whether trial counsel specifically advised Wolford of the government's March 2006 plea offer is ultimately immaterial given that the record reflects that Wolford was well aware of the existence and terms of the government's subsequent, more favorable plea offers extended in June and August 2006. *See infra.*

*United States v. Wolford,* 1:06cr113 (E.D.Va. May 23, 2006) (Order). According to Wolford, trial counsel was "excited" at the conclusion of the May 23, 2006 status hearing and told Wolford as they were leaving the courthouse that the government "was even going to recommend 5K." Tr. at 26. Wolford does not recall asking trial counsel on that occasion what 5K meant, but she "assumed from then on," incorrectly of course, that "5K meant probation." Tr. at 26.[7]

On May 25, 2006, a "de-brief and proffer" session was held at the Phoenix House, during which Wolford and trial counsel met for approximately two to three hours with several government agents, including the lead case agent, Matthew Schneck. *See* CJA Voucher; Tr. at 28. At that meeting, Wolford signed an immunity agreement—a document that she described as providing that anything she said in the course of the meeting "could not be held against [her] but anything [she] lied about ... could be held against [her]." Tr. at 30–31. Among the subjects discussed at the May 25, 2006 meeting was Wolford's possible cooperation with law enforcement authorities. In this regard, Wolford indicated that she was not willing to wear a wire into a doctor's office, as the agents asked, but that she "would show them how" to get pills by taking an undercover law enforcement agent posing as Wolford's "cousin" with her to the doctor's office. Tr. at 32.

In the days following the May 25, 2006 proffer session at the Phoenix House, trial counsel spoke separately with both Wolford and government counsel about the details of the meeting and the possible scheduling of a plea hearing. *See* CJA

Voucher. Then, on June 15, 2006, trial counsel received and reviewed a "plea form from the government." *Id.* Later that day, trial counsel spoke with Wolford on the telephone regarding the government's plea offer. *Id.* Shortly thereafter, on June 19, 2006, and presumably at the parties' request, the Clerk's Office scheduled a plea hearing in this matter for June 20, 2006. Wolford, who was then on conditions of release, was directed to appear at the courthouse on June 20 for, as she put it, "a plea—plea negotiation—plea agreement." Tr. at 33.

Wolford arrived at the courthouse on June 20, 2006, accompanied by her father and trial counsel, but the plea hearing did not go forward as scheduled. Instead, the government filed, and the trial judge granted, a fourth motion for an extension of the indictment period. *United States v. Wolford,* 1:06cr113 (E.D.Va. June 20, 2006) (Order). Also on that date, and at trial counsel's request, the parties met for approximately two to three hours in a conference room outside the trial judge's courtroom to review the terms of the government's plea offer. Tr. at 230. Present at this meeting were (i) Wolford, (ii) Wolford's father, (iii) trial counsel, (iv) government counsel, (v) Agent Schneck, the lead case agent, (vi) Detective Jimmy Horton from the Manassas City Police Department, and (vii) possibly another government agent. Tr. at 35, 158.

According to Agent Schneck, "[t]he case in its entirety was discussed" in the course of the lengthy June 20 meeting. Tr. at 230. During that meeting, government counsel also reviewed with Wolford, in detail, the terms of the government's plea offer, as well as the proposed plea docu-

---

**7.** *See* U.S.S.G. § 5K1.1 (providing that "[u]pon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines").

ments. And, with the exception of the health care fraud offense, which had been eliminated from the government's plea offer at trial counsel's request,[8] the essential terms of the government's June 20, 2006 plea offer were precisely the same as those that had been offered previously in March 2006. In other words, Wolford was offered the opportunity to plead guilty to a single charge of conspiracy, with a recommended base offense level of 28 to 30 based on drug quantity, and without any additional charges or requested enhancements related to Wolford's role in the offense, the firearm found in her residence, or the fact that the criminal activity occurred in a protected area.[9]

In addition to discussing the specific terms of the government's plea offer and the proposed plea documents, government counsel, in the course of the June 20, 2006 meeting, also reviewed the following with Wolford: (i) the evidence and testimony the government would present against her were the matter to proceed to trial, including evidence of multiple drug transactions between Wolford and a confidential informant, some of which were captured on audio tape, Tr. at 230; (ii) the statutory maximum penalties for the applicable offenses, Tr. at 159; (iii) the possible sentence Wolford might receive were she to be convicted at trial, Tr. at 230; (iv) the possible sentence Wolford might receive were she to plead guilty and cooperate with the government pursuant to the pro-

posed plea agreement, Tr. at 230; (v) the possibility of the government filing a motion to reduce Wolford's sentence based on her cooperation with law enforcement authorities, pursuant to U.S.S.G. § 5K1.1 or Rule 35, Fed. R. Crim. P., Tr. at 159; (vi) the quantity of pills and drug offense level for which the government sought to hold Wolford responsible in the proposed plea agreement, Tr. at 159–60; and (vii) the sentencing guidelines, Tr. at 234. According to Agent Schneck, Wolford appeared to understand all of the terms set forth in the proposed plea documents reviewed with her during the June 20, 2006 meeting. Tr. at 232.

With respect to the possible sentence, government counsel advised Wolford in the course of the June 20, 2006 meeting that she could receive "approximately 20 years" of imprisonment were she to be convicted following a jury trial, but that "if she pled with cooperation, she's looking at approximately two to three years," assuming the government's filing and the trial judge's granting of a motion for a reduction in her sentence, pursuant to U.S.S.G. § 5K1.1 or Rule 35, Fed. R. Crim. P. Tr. at 85, 230–31. Agent Schneck does not recall any group discussion during the course of the June 20, 2006 meeting concerning Wolford's criminal record or her likely criminal history calculation under the sentencing guidelines. Tr. at 233. Yet, trial counsel recalls showing Wolford the sen-

8. Tr. at 180. Specifically, it was trial counsel's position that a charge of health care fraud was not appropriate in this instance given that the majority of the controlled substances at issue had been obtained through the use of physician-issued medical prescriptions. Tr. at 157.

9. Significantly, the government did not make any promises to Wolford concerning what sentence she would ultimately receive were she to accept the government's plea offer. Instead, the government agreed only that it

would make certain guidelines' recommendations at sentencing, which, of course, would not bind the sentencing judge. *See* Rule 11(c)(1)(B), Fed. R. Crim. P. (providing that a plea agreement may specify that an attorney for the government will "recommend, or agree not to oppose the defendant's request, that a particular sentence or sentencing range is appropriate or that a particular provision of the Sentencing Guidelines ... does or does not apply").

tencing table set forth in the guidelines' manual and telling her that he "was pretty confident that her criminal history category would be a one." Tr. at 165–66.[10] And although trial counsel does not specifically recall advising Wolford what her likely offense level would be were she to accept the government's plea offer, he correctly notes that the proposed plea documents, which were reviewed in full with Wolford in the course of the June 20, 2006 meeting, included information concerning the applicable offense level. Tr. at 166. Indeed, the proposed statement of facts expressly provided that Wolford, were she to accept the government's plea offer, would be held accountable for the distribution of "Oxy and other pain pills . . . in an amount convertible to level 30 of the USSG." Gov't Ex. 4 to Oct. 9, 2009 Hr'g.[11]

The record is undisputed that Agent Schneck and government counsel provided much of the verbal explanation to Wolford during the course of the June 20, 2006 meeting. Nonetheless, it is equally clear that trial counsel also reviewed the proposed plea documents with Wolford on that occasion. Tr. at 40, 164–65, 195. Indeed, trial counsel specifically recalls reviewing the terms of the plea documents with Wolford in private, while the government representatives waited outside the conference room. Tr. at 195. In fact, trial counsel estimates that he spent approximately 30 to 40 percent of the two to three hour meeting with Wolford in private, while the remaining time was spent with the entire group. Tr. at 196.

In the end, Wolford did not agree to the terms of the government's plea offer on June 20, 2006. Specifically, she admits that she read and reviewed the proposed plea documents during the course of the June 20, 2006 meeting, but testified that she was "not comfortable" signing the papers and "wasn't ready" to enter a guilty plea on that date. Tr. at 36, 41. The record reflects that Wolford had two primary concerns at that time. First, she was concerned about the quantity of drugs for which the government sought to hold her accountable in the proposed plea agreement. As to this issue, Wolford testified that she did not believe that she had distributed "thousands and thousands of pills," as indicated in the proposed statement of facts,[12] and thus, that she could not "put [her] hand on a bible and swear that [she] did something that [she] didn't

---

10. In her sworn affidavit, Wolford states that trial counsel told her that her sentence would "likely be about the same" whether she went to trial or pled guilty. Pet. Aff. ¶ 11. Given the record as a whole, this statement simply is not credible. Also contradicted by credible record evidence are Wolford's statements (i) that trial counsel "never showed [her] the sentencing guidelines and what [her] sentence would likely be if [she] pled guilty as opposed to going to trial" and (ii) never explained to her prior to trial "what a Criminal History score was or how it would impact any potential sentence." *Id.* Finally, Wolford's statement that trial counsel "never told [her] what the 'safety valve' was or how it could impact [her] potential sentence," even if true, is immaterial to the questions presented here given that the safety valve provisions have no application to this case. *Id.*

11. Although the proposed statement of facts admitted into evidence in the course of the October 9, 2009 evidentiary hearing was a version that had been signed by the government in August 2006, the government proffered, and trial counsel testified, that this version was essentially identical to the version that was shown to, and discussed with Wolford in the course of the June 20 2006 meeting. Tr. at 150, 166–67, 179.

12. Wolford was apparently referring to a provision contained in the proposed statement of facts providing that McCauley admitted to law enforcement agents on February 23, 2006 that he and Wolford "bought, sold, and traded thousands of 40 mg and 80 mg [Oxy] pills," for personal use and for distribution to others. Gov't Ex. 4 to Oct. 9, 2009 Hr'g.

do." Tr. at 39. Yet significantly, the record is clear that Wolford did not ever dispute that she had distributed *some* quantity of controlled substances in this instance; instead, she merely contested the specific quantity of drugs for which she would be held responsible were she to accept the government's plea offer. Tr. at 40.[13]

Wolford's second concern with accepting the government's plea offer on June 20, 2006, related to her desire to avoid any period of incarceration. Indeed, she testified that a "major motivation" for her rejecting the government's June 20, 2006 plea offer was that she wanted the government to agree that she would not be required to serve any time in jail if she pled guilty. Tr. at 87–88. Trial counsel likewise testified that Wolford did not want to serve any jail time and that her "goal was always to obtain a plea for probation only if she pled at all." Tr. at 160. Thus, when trial counsel asked Wolford in June 2006 if she would be willing to accept a plea agreement that did not guarantee her probation, she remained "very insistent that she wanted no jail time" and "did not want to consider going to jail at all." Tr. at 185–86. Consistent with this, Agent Schneck testified that Wolford "was not satisfied" with the plea offer extended by the government on June 20, 2006, because she wanted to serve "zero" confinement. Tr. at 231.

By letter dated June 25, 2006, the government reiterated its offer to allow Wolford to plead guilty in accordance with the terms that had been reviewed with her in the course of the June 20, 2006 meeting. Gov't Ex. 2 to Oct. 9, 2009 Hr'g. Trial counsel received, reviewed and promptly disclosed the government's June 25, 2006 written plea offer to Wolford. *See* CJA Voucher. Trial counsel also reviewed with Wolford the terms set forth in the government's June 25, 2006 plea offer, including specifically (i) the projected offense level, (ii) the fact that the government still wanted Wolford to plead guilty to a conspiracy charge, (iii) the government's agreement not to pursue any additional charges arising out of the fact that the offense occurred in a protected area, and (iv) the government's agreement not to pursue "the gun adjustment." Tr. at 155–56.

By its terms, the government's June 25, 2006 written plea offer provided that it would "expire on Monday, July 10, 2006," in the event Wolford did not expressly accept the offer by that date. Gov't Ex. 2 to Oct. 9.2009 Hr'g. Trial counsel spoke with government counsel concerning the outstanding plea offer on July 10; trial counsel also spoke with Wolford for nearly an hour on that date regarding the "plea and strategy." *See* CJA Voucher. Yet, the record does not reflect that trial counsel ever advised Wolford that the government's June 25, 2006 written plea offer included an express deadline of July 10, 2006.[14]

Approximately two weeks later, on July 25, 2006, trial counsel had separate telephone conversations with government

---

**13.** Trial counsel testified that although he advised Wolford that the government's proposed drug calculations were "a possible outcome," he, too, was "very disturbed about the number of pills" for which the government sought to hold Wolford accountable in the proposed plea documents. Tr. at 204. In fact, the record reflects that trial counsel continued to raise objections concerning the government's method of calculating the applicable drug quantity in this case even up to and including the time of sentencing.

**14.** This failure is ultimately immaterial as the government, in fact, remained willing to accept Wolford's plea under precisely the same terms long after July 10, 2006. Tr. at 42, 161; *see infra.*

counsel and Wolford concerning the government's filing of a fifth motion to extend the indictment period. Such a motion was then filed by the government on that date and subsequently granted by the trial judge, thereby extending the period in which the government was required to file an indictment in this matter until August 10, 2006. *United States v. Wolford,* 1:06cr113 (E.D.Va. Aug. 3, 2006) (Order). Prior to this deadline, on August 8, 2006, trial counsel spoke on the telephone with government counsel regarding another "proffer." *See* CJA Voucher. On the same day, trial counsel spoke with Wolford on two occasions—once for nearly an hour—regarding this "proffer." *Id.* Trial counsel also directed Wolford to appear at the courthouse for a meeting with the government and trial counsel for the "proffer" session that had been discussed on August 8, 2006, but ultimately the session was not held owing to the government's unavailability. Tr. at 45.

On August 10, 2006—the last day of the fifth authorized extension period—a federal grand jury returned the initial indictment in this matter charging Wolford and McCauley with one count of conspiracy to distribute oxycodone, methadone and cocaine, in violation of 21 U.S.C. § 846 (Count One). Wolford was also charged in the initial indictment with the following two substantive drug counts: (i) distribution of oxycodone, in violation of 21 U.S.C. § 841(a) (Count Two) and (ii) distribution of oxycodone within 1,000 feet of an elementary school, in violation of 21 U.S.C. § 860(a) (Count Three).

On August 11, 2006, the day after the indictment was returned, Wolford ap-

peared with trial counsel for an arraignment hearing before the trial judge. In the course of the hearing, Wolford, by trial counsel, entered a plea of not guilty, waived formal reading of the indictment and requested a trial by jury. A jury trial was thus scheduled to commence on November 28, 2006. Immediately following the arraignment, Wolford and trial counsel spoke briefly with government counsel and Agent Schneck in the hallway outside the courtroom. During that conversation, Wolford again expressed concern about the quantity of drugs for which she would be held accountable were she to accept the government's plea offer, stating words to the effect of, "We're talking less than a handful of pills." Tr. at 46. Agent Schneck, in response, reviewed with Wolford how the government had calculated its recommended drug quantity for sentencing-related purposes, namely by estimating the total amount of controlled substances obtained and distributed by Wolford and her co-conspirators during the course of the conspiracy, regardless of whether some of those controlled substances were obtained for personal use by Wolford or other co-conspirators. Tr. at 232–33. Wolford correctly understood Agent Schneck's explanation to mean that "if you distribute one pill out of a bottle that meant the whole bottle" could be counted for drug calculation purposes. Tr. at 46.[15] In other words, Wolford understood "that if [she] got a prescription ... from the pharmacy and distributed one pill, that it's part of the conspiracy that [she] distributed all of them...." Tr. at 65.

At the conclusion of the August 11, 2006 discussion outside the courtroom, govern-

---

15. *See, e.g., United States v. Williams,* 108 F.3d 1375 (Table), 1997 WL 123138, at *1 (4th Cir.1997) (concluding that the district court did not clearly err in counting all of the controlled substances obtained by prescrip-

tions during the course of a conspiracy, including amounts obtained for personal use by the conspirators, when calculating the applicable drug weight for sentencing purposes) (citations omitted).

ment counsel suggested that the parties meet again in two weeks, presumably for further plea discussions. Tr. at 47. According to Wolford, she responded "Yes" to government counsel's suggestion in this regard, but trial counsel said "No," advising Wolford that he would "talk about it [with her] later." *Id.* Then, when Wolford later asked trial counsel to set up another plea meeting with the government, he responded by telling her that the government was "never going to agree to anything you want." *Id.*[16] In this regard, trial counsel advised Wolford that the government was "never going to offer [her] probation" in exchange for her guilty plea, and that the closest she might come to receiving a sentence of probation was "if she were to plead [guilty] and work a deal and do all the things [the government] wanted her to do in cooperation." Tr. at 225. Similarly, trial counsel told Wolford "that the only chance she really [had] to get a Rule 35 or a 5K" was if she pled guilty. Tr. at 226. Finally, trial counsel advised Wolford that were she to plead guilty, she would likely receive a two-level reduction to her offense level, pursuant to U.S.S.G. § 3E1.1(a), for acceptance of responsibility; trial counsel does not specifically recall advising Wolford about the third level of credit for acceptance of responsibility permissible on the government's motion under U.S.S.G. § 3E1.1(b). Tr. at 167–68.

On August 30, 2006, trial counsel met with Wolford for approximately one hour to discuss "trial strategy." *See* CJA

Voucher. The following day, trial counsel received and reviewed another government plea offer and accompanying proposed plea documents. These documents included a 17–page proposed plea agreement signed by the government on August 31, 2006, together with a proposed criminal information and statement of facts, both signed by the government without a date, as well as an unsigned and undated waiver of indictment. Govt. Ex. 4 to Oct. 9.2009 Hr'g.[17]

Unlike the June 25, 2006 written plea offer, the government's August 31, 2006 plea offer did not appear to have an express deadline. Moreover, the terms of this offer were essentially the same as those that previously had been extended to Wolford, both in the June 20, 2006 group plea meeting and again in the government's June 25, 2006 written plea offer. Thus, the government's August 31, 2006 plea offer contemplated Wolford entering a plea of guilty to a one-count criminal information charging her with conspiracy to distribute oxycodone, in violation of 21 U.S.C. § 846. Also consistent with the government's June 2006 offers, the August 31, 2006 proposed plea documents sought to hold Wolford accountable for the distribution of "Oxy and other pain pills ... in an amount convertible to level 30 of the U.S.S.G. § ," with no additional charges or enhancements related to (i) Wolford's role in the offense, (ii) the firearm found at her residence, or (iii) the fact that the criminal activity occurred in a protected location. Gov't Ex. 4 to Oct. 9, 2009 Hr'g.

---

**16.** Wolford further testified that she asked trial counsel "to write up a plea agreement" to submit to the government, "something in writing hoping that they would come back with something," but that trial counsel did not do so. Tr. at 48.

**17.** A waiver of indictment was necessary under the terms of the proposed plea agreement as Wolford was offered the opportunity to

plead guilty to a single-count criminal information rather than to any of the charges that had been presented to the grand jury and filed against her in the August 10, 2006 indictment. The proposed plea agreement further provided that in the event Wolford pled guilty to the one-count criminal information, the government would move to dismiss the pending indictment against her.

The record reflects that trial counsel promptly disclosed the government's August 31, 2006 plea offer to Wolford. Indeed, counsel's certified voucher confirms that he spoke with Wolford concerning the plea offer for over thirty minutes on August 31, 2006. *See* CJA Voucher. Notably, this conversation is the last plea-related entry included in trial counsel's voucher. Trial counsel nonetheless testified that he continued to speak generally with Wolford "about taking the plea almost all the way up to the trial .date." Tr. at 162. In this regard, trial counsel recalls having "many separate discussions" with Wolford throughout the plea negotiation process. Tr. at 181. For example, he "remember[s] recommending specifically that [Wolford] take the plea," telling her that "[y]ou're looking at a lot of time if you don't take the plea." Tr. at 213. He also advised Wolford that "[she] should be taking the plea" given the fact that the government had "a lot of evidence against [her]." Tr. at 214. In this regard, trial counsel advised Wolford on more than one occasion that "it [w]as going to be a very difficult trial" and "that it would be a very difficult case to win." Tr. at 206, 211. Trial counsel also discussed with Wolford some of the likely consequences to her if she did not accept the government's plea offer, including specifically (i) the possibility of the government filing a superseding indictment charging her "with many more counts than what the plea had in it," including "the school charge," and (ii) the fact that she would be "looking at a significant amount of jail time if she was convicted" at trial. Tr. at 181–82, 188.[18]

Throughout the month of September 2006, trial counsel engaged in several telephone calls with government counsel and with Wolford regarding the status of the case and various discovery and trial-related matters. *See* CJA Voucher. During this period, trial counsel also received and reviewed the government's proposed discovery order. *Id.* At the end of that month, on September 26, 2006, trial counsel met with Wolford for over an hour to prepare for trial and to discuss "defenses." *Id.*

On October 5, 2006, a federal grand jury returned a ten-count superseding indictment against Wolford and McCauley, adding several new substantive distribution charges against Wolford, as well as new allegations concerning several additional types of controlled substances. Specifically, in Count One, Wolford was charged with conspiring with McCauley and others to distribute oxycodone, hydromorphone, methadone hydrochloride, dextroamphetamine, morphine and cocaine within 1,000 feet of a school, in violation of 21 U.S.C. §§ 841(a), 846 and 860. In addition to the conspiracy charge, Wolford was also charged with (i) eight substantive counts of distributing oxycodone and other controlled substances, in violation of 21 U.S.C. § 841(a) and 18 U.S.C. § 2 (Counts Two through Nine), and (ii) one count of distributing oxycodone and other controlled substances within 1,000 feet of a school, in violation of 21 U.S.C. § 860(a) (Count Ten).

Arraignment on the superseding indictment was held on October 12, 2006, in the course of which the trial judge directed that the jury trial would commence, as previously scheduled, on November 28, 2006. Following arraignment, government counsel met with Wolford and trial counsel outside the courtroom. According to Wol-

---

**18.** Wolford likewise recalls government counsel advising her that she "would get a lot of time if [she] went to trial." Tr. at 69.

ford, government counsel was visibly upset during the meeting and at one point declared, "And now we're going to trial." Tr. at 51. Consistent with Wolford's recollection, trial counsel testified that around the time of the superseding indictment, government counsel told him and Wolford, "That's it. We're going to trial." Tr. at 204.[19]

In the months preceding the scheduled jury trial, trial counsel devoted a substantial amount of time to trial preparation, both on his own and together with Wolford. Trial counsel's certified voucher alone includes entries for more than (i) 70 hours in pretrial interviews and conferences, (ii) 40 hours obtaining and reviewing discovery and other documents, (iii) 9 hours performing legal research and writing, and (iv) 7 hours performing investigative and other work. *See* CJA Voucher. Trial counsel also participated in numerous telephone and in-person conferences with Wolford in the months preceding trial, including conferences related specifically to "trial strategy," "trial prep," "elements of statute," "case law," "expected [trial] process," "defenses," "possible testimony," and "stipulations." *Id.*[20]

Wolford likewise recalls having at least two trial preparation meetings with trial counsel, including (i) a meeting at trial counsel's office during which she reviewed all of the evidence that had been provided by the government in its open-file discovery exchange, including various documents and law enforcement reports, as well as audio tapes and transcripts of the drug transactions that had been recorded by the confidential informant, and (ii) a meeting at her parents' home during which trial counsel spoke with her and several of her family members about the upcoming trial. Tr. at 52–54; 89–90.[21]

Wolford also acknowledged that she met with trial counsel "approximately three times, if not more," to discuss "[her] defense" prior to trial. Tr. at 72. Based on these discussions with trial counsel, Wolford believed that three defenses would be raised on her behalf at trial, namely (i) her alleged intoxication during the charged conspiracy, (ii) entrapment by an agent of the government, and (iii) the so-called "household" or "family member" defense. Tr. at 58. Wolford testified that she believed her "primary defense was going to be intoxication and that [she] would be showing who [she] was before, during and

19. Wolford testified that she did not believe that entering a guilty plea continued to be an option following arraignment on the superseding indictment. *Id.* Yet, trial counsel testified that he continued to talk generally with Wolford "about taking the plea almost all the way up to the trial date," at least as late as October 2006. Tr. at 162, 212. And, as before, Wolford's response was that she would only plead guilty "[i]f it was no jail. She did not want jail." Tr. at 212. In any event, according to trial counsel, plea discussions with the government "fizzled out certainly by November" 2006. Tr. at 224, 227–28.

20. Additional facts pertinent only to Wolford's claim that trial counsel was ineffective in failing to interview certain potential defense witnesses and in failing to advise or prepare

Wolford adequately concerning her own trial testimony are discussed *infra*, Part II(C).

21. According to Wolford's brother, trial counsel told him during the course of this meeting that Wolford, if convicted at trial, "might get a year, maybe three but I doubt it." Tr. at 98. The record does not reflect whether Wolford was present for or overheard this conversation between her brother and trial counsel. Moreover, the testimony presented by Wolford's brother in the course of the evidentiary hearing was far from wholly credible, particularly given his testimony that he thought he "could just get up and say what [he] wanted" were he to testify at Wolford's trial and that it "never entered [his] mind" that he would be subject to any questioning or cross-examination by the government. Tr. at 99.

after" the charged conspiracy. Tr. at 55.[22] But more significantly, Wolford testified that trial counsel "told [her] about the household instruction," specifically advising her "that if ... the people lived in the house that it was okay to give them pills as long as they were family members." Tr. at 60. Thus, Wolford further states in her sworn affidavit that she "believed it was legal to distribute prescription drugs to family and household members but not for money," and that trial counsel "never, at any point during the course of his representation, told [her] otherwise." Pet. Aff. ¶ 6.

Trial counsel, for his part, testified that he advised Wolford that "many of her defenses were what [he would] call imperfect," meaning "that they meet some elements of what the classic defense would be but other elements it didn't," and that because of this, the "defense[s] didn't make it and would not work." Tr. at 214. For example, trial counsel "talked [with Wolford] about imperfect entrapment," including specifically "the behavior of some of the Government's witnesses ... and different things that Melanie [Burgess, the government's confidential informant,] had done in this case." Tr. at 215. Trial counsel also discussed with Wolford what

he referred to as the "family member defense." [23] In this regard, although trial counsel does not recall whether he advised Wolford that the "family member defense" was "completely viable or not," he did "put a lot of faith in it ... personally," and communicated his personal belief in this purported defense to Wolford during the pretrial proceedings. Tr. at 215.

In addition to trial counsel's advice concerning possible defenses to the charged conduct, trial counsel also advised Wolford about another possible "trial strategy" that could be pursued concerning the drug quantity for which she might eventually be held accountable were she to be convicted at trial. Tr. at 169. As to this issue, it was trial counsel's view throughout these proceedings that Wolford should not be held criminally responsible for purposes of a drug conspiracy or distribution charge for any quantity of controlled substances or pills that she personally ingested. *Id.* Trial counsel remained steadfast in this view even up to the time of sentencing, despite the fact that the contrary view—advocated by the government throughout the plea negotiation proceedings—was supported by Fourth Circuit precedent.[24] Trial counsel also recalls discussing his view in this regard with Wolford prior to

---

**22.** *See also* Pet. Aff. ¶ 8 (providing that "I believed my intoxication was our primary defense and that several doctors as well as counselors from the Phoenix House would be testifying about the effects of drugs and my own recovery").

**23.** Trial counsel's reference to a "family member defense" is unclear; he may have been referring to the Virginia state law concept of "accommodation," which has no counterpart in the federal drug statute. *See* Va. Code § 18.2–248.1(a) (providing for reduced penalties if a defendant "proves that he gave, distributed or possessed with intent to give or distribute marijuana only as an accommodation to another individual and not with intent to profit thereby from any consid-

eration received or expected"). To be sure, the record reflects that the majority of trial counsel's prior experience at the time of his appointment in this case had been in the Virginia state context. Tr. at 193. In fact, trial counsel testified that although he had "done many [federal] pleas," he had handled only one federal trial prior to the instant case. *Id.*

**24.** *See Williams*, 1997 WL 123138, at *1 (concluding that the district court did not clearly err in counting all of the controlled substances obtained by prescriptions during the course of a conspiracy, including amounts obtained for personal use by the conspirators, when calculating the applicable drug weight for sentencing purposes).

trial, advising her "about how [he] thought [her personal drug use] should affect what her guidelines would be in sentencing and using that as a possible trial strategy." Tr. at 169–70. In this regard, trial counsel testified that he hoped to "eat away" at the applicable drug quantity at trial by "showing that [Wolford] wasn't responsible for this ... offense in as large amount as the Government thought she was." Tr. at 216. In other words, trial counsel believed that Wolford's personal use of many of the prescription drugs involved in the charged conspiracy might, as he put it, "ameliorate the consequence in the long run to Ms. Wolford." Tr. at 170.

Significantly, trial counsel acknowledged in the course of the October 9, 2009 evidentiary hearing that "the more [he] look[s] at it," "[he] never really thought [he] could beat the conspiracy" charge at trial. Tr. at 216. Yet, the record does not reflect that trial counsel ever advised Wolford of his view in this regard during the pretrial and plea negotiation proceedings. Nor does the record reflect that trial counsel ever advised Wolford about the impact and significance of relevant conduct in determining a defendant's sentencing guidelines range. For example, trial counsel did not advise Wolford that were she to be convicted of the conspiracy charge at trial, "it didn't matter how many other charges she's acquitted of she was going to get hit for the whole [drug] weight." Tr. at 215–16. Similarly, the record does not reflect that trial counsel ever advised Wolford that a conviction on the conspiracy charge alone would render her accountable for all of the "reasonably foreseeable" controlled

substances that she and her co-conspirators distributed and possessed with the intent to distribute during the course of the conspiracy. *See* U.S.S.G. § 1B1.3 (providing that "in the case of a jointly undertaken criminal activity," a defendant's base offense level shall be determined on the basis of the defendant's own acts as well as "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity"); *United States v. Lamarr,* 75 F.3d 964, 972 (4th Cir.1996) (recognizing that "[a] defendant's Base Offense Level under the Guidelines is determined by the amount of drugs reasonably foreseeable to him within the scope of the unlawful agreement"). Nor does it appear in this record that trial counsel advised Wolford that the applicable drug quantity for sentencing-related purposes would ultimately be determined by the trial judge using only a preponderance of the evidence standard, provided the resulting sentence was still within the allowable statutory range of imprisonment.[25] *See United States v. Brooks,* 524 F.3d 549, 560 n. 20 (4th Cir. 2008) (noting that "[a]lthough a sentencing court is free to calculate the advisory Guidelines range using facts that it finds by a preponderance of the evidence, including individualized drug quantities, it must do so within the confines of the applicable statutory range" given the Supreme Court's decisions in *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) and *United States v. Booker,* 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005)).[26] Indeed, Wolford

---

**25.** For example, the conspiracy charged in Count One of the superseding indictment had a statutory maximum term of imprisonment of 480 months, while the substantive distribution offenses charged in Counts Three and Four had a statutory maximum term of 240

months. *See* 21 U.S.C §§ 841(b)(1)(C) and 860(a).

**26.** In *Apprendi,* the Supreme Court held essentially that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime *beyond the prescribed statutory*

states in her sworn affidavit that trial counsel "never explained to [her] that as long as [she] was found guilty of one charge, the court could sentence [her] based on conduct [she] was acquitted of or any other conduct not alleged but proven at [her] sentencing by a preponderance of the evidence." Pet. Aff. ¶ 11.

In sum, then, the record reflects the following essential facts concerning trial counsel's advice to Wolford during the plea negotiation and pretrial proceedings in this matter:

- Trial counsel properly and promptly disclosed to Wolford the government's June 2006 and August 2006 plea offers.[27]
- Wolford (i) read the proposed plea documents provided by the government in June 2006, (ii) reviewed and discussed those documents, both with trial counsel alone, and with trial counsel and government representatives in a group setting, and (iii) understood the essential terms of the plea offer extended by the government in June 2006, and then again in August 2006. Specifically, Wolford understood that these plea offers provided her with the opportunity to plead guilty to a single charge of conspiracy, with a recommended base offense level of 28 to 30 based on drug quantity, and without any additional charges or recommended

enhancements related to her role in the offense, the firearm found in her residence, or the fact that the criminal activity occurred in a protected area.

- Wolford did not accept the government's June 2006 or August 2006 plea offers because (i) she did not agree with the specific quantity of drugs for which the government sought to hold her responsible in the proposed plea documents, and (ii) she did not want to serve any jail time. Wolford nonetheless wanted to reach a plea agreement with the government in this case, as she did not dispute that she had distributed some quantity of controlled substances during the relevant period.

- Trial counsel appropriately advised Wolford that the government was not going to agree to recommend a sentence of probation with no jail time, as Wolford wanted, and that the closest she might come to a probationary sentence would be to accept the government's plea offer and cooperate with the government. Trial counsel also advised Wolford that she should accept the government's plea offer in light of the substantial evidence against her and the risk of additional charges being filed and pursued against her at trial, including the school charge. Wolford was further

*maximum* must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. 466, 120 S.Ct. 2348 (emphasis added). Thereafter, the Supreme Court in *Booker* applied its *Apprendi* line of decisions to hold that the United States Sentencing Guidelines violated the Sixth Amendment insofar as they allowed a defendant's sentence to be increased based on findings of fact made by a judge (other than a prior conviction) rather than by a jury beyond a reasonable doubt, and that the proper remedy was to render the guidelines advisory. *See Booker*, 125 S.Ct. at 755–67. Yet, it is important to note that even post-*Booker*, district courts are still required to make findings of fact in the course of the sentencing proceedings. In-

deed, "a district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines" and then "shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in [18 U.S.C.] § 3553(a) before imposing the sentence." *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir.2005).

27. Although the record is less clear with respect to whether trial counsel advised Wolford of the government's March 2006 plea offer, that issue is ultimately immaterial to the claims raised here.

advised, both by trial counsel and government counsel, that she would be subject to a much more severe sentence were she to be convicted at trial rather than accept the government's plea offer.

• Throughout the pretrial proceedings, trial counsel advised Wolford that three defenses would be pursued on her behalf were she to proceed to trial, namely: (i) intoxication, (ii) entrapment, and (iii) the "family member defense." The record does not reflect whether trial counsel ever specifically advised Wolford that these defenses were "completely viable." Tr. at 215. Yet, trial counsel admits that he communicated to Wolford his strong personal belief in the so-called "family member defense" prior to trial. Tr. at 215. Given this, Wolford continued to decline the government's plea offers and proceeded to trial believing incorrectly that "it was legal to distribute prescription drugs to family and household members but not for money" and "that in order to be guilty, the government had to prove that [she] sold people drugs for profit." Pet. Aff. ¶ 6. Trial counsel also incorrectly advised Wolford that her personal drug use might be a "possible trial strategy," as he did not agree with the government that Wolford should be held criminally accountable for drugs that she personally ingested during the alleged conspiracy.

• Although trial counsel was clearly well-meaning throughout the plea negotiation process, the record reflects that he never advised Wolford about the impact and significance of relevant conduct in determining a defendant's sentencing guidelines range. For example, trial counsel did not advise Wolford that a conviction at trial on the conspiracy charge alone would render her accountable for all of the "reasonably foreseeable" controlled substances that she and her co-conspirators distributed and possessed with the intent to distribute during the entire course of the conspiracy. U.S.S.G. § 1B1.3. Similarly, trial counsel never advised Wolford "that as long as [she] was found guilty of one charge, the court could sentence [her] based on conduct [she] was acquitted of or any other conduct not alleged but proven at [her] sentencing by a preponderance of the evidence," provided that the sentence was within the applicable statutory range of imprisonment. Pet. Aff. ¶ 11.

Just days before the scheduled trial, Wolford wrote a letter to the trial judge requesting a continuance to provide her and trial counsel additional time to prepare for trial. Tr. at 56. In response to Wolford's letter, the trial judge held a status conference on November 27, 2006, in the course of which Wolford reiterated her request for a continuance. Trial counsel supported Wolford's request in this regard, indicating that he had "been busy with a lot of state cases" and would benefit from additional time to prepare for trial; trial counsel represented that he "could be ready in a week." Tr. at 57. In the circumstances, the trial judge granted Wolford's motion and continued the trial for one week, to December 4, 2006. On that day, Wolford orally requested a second continuance of the trial, this time requesting that trial counsel be removed from the case and that she be given additional time to retain new counsel to represent her at trial. Tr. at 57. The trial judge denied Wolford's oral request for a second continuance, but nonetheless provided her the option of representing herself at trial, with trial counsel to serve as standby counsel. Alternatively, Wolford was granted leave to retain new counsel to represent her at trial, provided that such counsel was willing and able to commence trial the following day. In the end, the

jury trial was continued one additional day.

Trial began on December 5, 2006, with trial counsel continuing to serve on Wolford's behalf.[28] In the course of the trial, the government presented extensive evidence and testimony from more than twenty witnesses establishing overwhelmingly that from 2001 to 2006, Wolford conspired with McCauley and others to distribute large quantities of various controlled substances, including oxycodone, out of Wolford's Manassas residence, which was located within 1,000 feet of an elementary school. The trial evidence established that most of these controlled substances were obtained by Wolford and McCauley through written prescriptions from known physicians, while additional quantities were purchased from other suppliers or obtained from other users or suppliers through trade.

Among the government's testifying witnesses at trial were (i) McCauley, who testified at length about the nature and extent of the charged conspiracy, (ii) numerous individuals who either sold, purchased or traded controlled substances with Wolford and McCauley during the course of the conspiracy, and (iii) the confidential informant who purchased controlled substances from Wolford on multi-ple occasions and recorded several of these transactions on audio tape. Wolford also testified on her own behalf and, after initially denying the charged conduct, eventually admitted that she distributed controlled substances during the relevant time period, both to family members and to other individuals who were neither household nor family members.

Not surprisingly, on December 14, 2006, following approximately six days of testimony and deliberations, the jury trial culminated in a guilty verdict on the conspiracy charged in Count One of the superseding indictment. Wolford was also convicted of the substantive drug counts charged in Counts Three and Four,[29] but was acquitted as to the remaining counts. Based on the trial record, and with the inclusion of additional uncharged and acquitted relevant conduct found by the trial judge to have been established by a preponderance of the evidence, Wolford was held accountable for the equivalent of 21,-626.76 kilograms of marijuana in the Presentence Investigation Report (PSIR),[30] placing her in a base offense level of 36. This base offense level was then increased by a total of six levels, comprised of (i) a two-level enhancement pursuant to U.S.S.G. § 2D1.2(a)(1) be-

---

28. Only Wolford proceeded to trial in this case, as McCauley entered into a plea agreement with the government on November 16, 2006. Specifically, McCauley pled guilty to the drug conspiracy charged in Count One of the superseding indictment, while the remaining substantive distribution counts against him were dismissed on the government's motion. *See United States v. McCauley*, 1:06cr113 (E.D.Va. Dec. 27, 2006) (Order). On December 27, 2006, McCauley was sentenced to 48 months imprisonment on the drug conspiracy conviction, to be followed by six years of supervised release.

29. Counts Three and Four involved Wolford's distribution of oxycodone to the confidential informant on two specific occasions, both of which were captured on audio tape.

30. This total included the following: (i) 7,352 grams of fentanyl (equivalent to 18,380 kilograms of marijuana); (ii) 60.62 grams of amphetamine (equivalent to 1,212.40 kilograms of marijuana); (iii) 1.15 grams of hydrocodone (a Schedule III controlled substance with no marijuana equivalency); (iv) 1,551 grams of methadone (equivalent to 775.50 kilograms of marijuana); (v) 187.75 grams of oxycodone (equivalent to 1,257.93 kilograms of marijuana); and (vi) 4.65 grams of cocaine (equivalent to .93 kilograms of marijuana).

cause the offenses occurred near a protected location, (ii) a two-level enhancement pursuant to U.S.S.G. § 3B1.1(c) because Wolford was "an organizer, leader, manager or supervisor" in the charged criminal activity, and (iii) a two-level obstruction of justice enhancement pursuant to U.S.S.G. § 3C1.1 based on Wolford's untruthful testimony at trial. This total offense level of 42, combined with Wolford's calculated criminal history category of II, resulted in a guidelines range of imprisonment of 360 months to life. Ultimately, on March 19, 2007, after adopting the factual findings and guidelines calculations set forth in the PSIR, the trial judge sentenced Wolford to concurrent terms of imprisonment of 108 months as to each of the three counts of conviction, a very significant downward variance (more then 250 months) from the bottom of the applicable guidelines range of imprisonment.

Following sentencing, Wolford retained new counsel, who then assisted her in filing a timely direct appeal to the Court of Appeals for the Fourth Circuit. In the appeal, Wolford raised only two arguments, namely (i) that the trial judge erred by failing to order a competency hearing in this case, and (ii) that trial counsel was ineffective in several respects. On April 2, 2008, the Fourth Circuit affirmed Wolford's convictions and sentence by unpublished per curiam opinion. *See United States v. Wolford*, 271 Fed.Appx. 372 (4th Cir.2008). Specifically, the Fourth Circuit concluded, first, that the trial judge had not abused his discretion in failing to order a competency hearing and second, that Wolford had "failed to meet the demanding burden of showing ineffective assistance of trial counsel on direct appeal." *Id.* at 373. In so holding, the Fourth Circuit specifically noted that "to allow for adequate development of the record, claims of ineffective assistance generally should be brought in a 28 U.S.C. § 2255 (2000) motion." *Id.* (citing *United States v. Hoyle*, 33 F.3d 415, 418 (4th Cir.1994)).

On June 30, 2009, Wolford, by newly retained counsel—different from the retained counsel who filed the direct appeal on her behalf—filed a timely motion to vacate, set aside or correct sentence, pursuant to 28 U.S.C. § 2255. In the instant motion, Wolford raises five claims: (i) that the trial judge abused his discretion in denying Wolford's second motion for a continuance of the trial, (ii) that trial counsel was ineffective during the plea negotiation and pretrial proceedings, (iii) that trial counsel was ineffective in preparing for the jury trial, (iv) that trial counsel was ineffective in failing to object to an alleged prejudicial comment made by the trial judge in the course of the trial, and finally (v) that trial counsel was ineffective in the course of the sentencing proceedings. Wolford also contends that appellate counsel was ineffective in failing to raise several of these arguments on direct appeal.

An evidentiary hearing concerning Wolford's § 2255 allegations was held on October 9, 2009, in the course of which the parties presented evidence and testimony from five witnesses, namely (i) Wolford, (ii) Wolford's brother, (iii) appellate counsel, (iv) trial counsel, and (v) Agent Schneck. Wolford's § 2255 claims are thus ripe for disposition and are addressed here.

## II.

Wolford's claims are governed by well-settled legal principles. In this regard, it is clear that collateral review under § 2255 is limited. Specifically, to be entitled to relief under § 2255, a prisoner must demonstrate either a lack of jurisdiction by the convicting court, a constitutional error, or a legal error so grave as to constitute " 'a fundamental defect which

inherently results in a complete miscarriage of justice.'" *United States v. Addonizio,* 442 U.S. 178, 185, 99 S.Ct. 2235, 60 L.Ed.2d 805 (1979) (quoting *Hill v. United States,* 368 U.S. 424, 428, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962)). In this case, the majority of Wolford's § 2255 claims are constitutional in nature, as they involve allegations of ineffective assistance of counsel in violation of the Sixth Amendment.

It is well-established that a two-prong analysis applies to an ineffective assistance of counsel claim. *See Strickland v. Washington,* 466 U.S. 668, 688–89, 104 S.Ct. 2052, 80 L.Ed.2d 674(1984). Specifically, to prevail on such a claim, a petitioner must show, first, that counsel's performance "fell below an objective standard of reasonableness." *Id.* at 688, 104 S.Ct. 2052. Judicial review of counsel's performance in this context is "highly deferential." *Id.* at 689, 104 S.Ct. 2052. Indeed, to establish that counsel's performance was objectively unreasonable, a petitioner must overcome the strong presumption that counsel rendered "adequate assistance and made all significant decisions in the exercise of reasonable judgment." *Id.* at 690, 104 S.Ct. 2052.

If a petitioner is able to demonstrate that counsel's performance was objectively unreasonable, *Strickland* next requires the petitioner to establish that "the deficient performance prejudiced the defense." *Id.* at 688, 104 S.Ct. 2052. Specifically, in step two of the *Strickland* analysis, a petitioner must demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. A proper prejudice analysis also requires consideration of whether "the result of the proceeding was fundamentally unfair or unreliable." *Lockhart v. Fretwell,* 506 U.S. 364, 369, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). Thus, counsel may be deemed constitutionally ineffective only if his or her "conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland,* 466 U.S. at 686, 104 S.Ct. 2052.

Significantly, when a federal prisoner raises a claim that could have been, but was not, pursued on direct appeal, "the movant must show cause and actual prejudice resulting from the errors of which he complains or he must demonstrate that a miscarriage of justice would result from the refusal of the court to entertain the collateral attack." *United States v. Mikalajunas,* 186 F.3d 490, 492–93 (4th Cir.1999) (citations omitted).[31] In this regard, "[t]he existence of cause for a procedural default must turn on something external to the defense, such as the novelty of the claim or a denial of effective assistance of counsel." *Id.* at 493 (citation omitted). Alternatively, "in order to demonstrate that a miscarriage of justice would result from the refusal of the court to entertain the collateral attack, a movant must show actual innocence by clear and convincing evidence." *Id.*[32]

It remains to apply these guiding principles to Wolford's specific § 2255 claims.

---

**31.** *See also United States v. Landrum,* 93 F.3d 122, 124–25 (4th Cir.1996) (providing that "[a] claim raised for the first time in a § 2255 motion generally is not cognizable in federal court unless the petitioner demonstrates both (1) cause excusing his … procedural default and (2) actual prejudice resulting from the errors of which he complains") (internal quotation marks and citation omitted).

**32.** An actual innocence claim is neither asserted in Wolford's motion nor addressed here.

## A.

Wolford's first § 2255 claim is that the trial judge abused his discretion in denying her second motion for a continuance of the jury trial. Because this issue could have been, but was not raised on direct appeal, Wolford "must show cause [for the procedural default] and actual prejudice resulting from the errors of which [s]he complains...." *Mikalajunas*, 186 F.3d at 492–93.

■ Here, Wolford argues that appellate counsel was constitutionally ineffective in failing to raise the continuance issue on direct appeal. This alleged ineffective assistance, she contends, satisfies the requisite cause for the procedural default. Simply put, Wolford's claim in this regard must be rejected, as she is unable to establish that appellate counsel was ineffective in this respect. This is so in light of the credible and undisputed testimony presented by appellate counsel in the course of the evidentiary hearing. To be sure, appellate counsel testified that he raised two issues on Wolford's behalf on direct appeal, one related to trial counsel's failure to request—and the trial judge's failure to hold *sua sponte*—a competency hearing prior to Wolford's trial, and the second pertaining to trial counsel's alleged ineffective assistance in the course of the proceedings. Tr. at 116–20. Although appellate counsel knew that Wolford's second motion to continue the trial had been denied by the trial judge, he opted not to raise the continuance issue on appeal for a number of reasons, namely (i) the second continuance motion was made on the eve of trial and, in his experience, "courts do not look favorably on motions for continuances on the eve of trial," (ii) the motion

was essentially granted in part, as the trial was continued an additional day, having already been continued a full week on Wolford's first motion to continue, and (iii) he did not believe that objecting to the denial of Wolford's second motion to continue would be "beneficial to the appeal." Tr. at 121. In fact, appellate counsel further testified that he did not believe Wolford had any particularly strong arguments on direct appeal and that had he been appointed, rather than retained, he would have considered filing an *Anders*[33] brief stating the same. Tr. at 126.

Given appellate counsel's credible and undisputed testimony, Wolford is unable to overcome the strong presumption that appellate counsel rendered "adequate assistance and made all significant decisions in the exercise of reasonable judgment," including specifically his decision not to appeal the trial judge's denial of Wolford's second motion for a continuance. *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052; *see also Jones v. Barnes*, 463 U.S. 745, 754, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983) (recognizing that appellate counsel is not required to raise every non-trivial issue on appeal). Wolford is also unable to establish the requisite prejudice arising out of appellate counsel's failure to raise the continuance issue on direct appeal, as such an argument would surely have been rejected by the Fourth Circuit for the reasons discussed *infra*. Thus, because Wolford is unable to establish that appellate counsel was ineffective in failing to raise the continuance issue on direct appeal, her § 2255 claim that the trial judge erred in denying her second motion for a continuance must be denied as procedurally defaulted.

---

**33.** *Anders v. California*, 386 U.S. 738, 744, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967) (holding that "if counsel finds his case to be wholly frivolous, after a conscientious examination of

it, he should so advise the court and request permission to withdraw," together with a brief referring to anything in the record that might arguably support the appeal).

■ Even absent the procedural default, Wolford's § 2255 claim on the continuance issue would nonetheless fail on the merits. In this regard, it is clear that the denial of a motion for a continuance is reviewed for an abuse of discretion. *See United States v. Hedgepeth,* 418 F.3d 411, 419 (4th Cir.2005) (noting that "a trial court's denial of a continuance is ... reviewed for abuse of discretion"). Here, the record reflects that the trial judge viewed Wolford's second motion for a continuance of the trial—made by Wolford orally on the morning of the already-continued trial—as a delay tactic. Indeed, the trial judge specifically noted on the record that he believed Wolford was "stalling" and that she had "play[ed] games with the Court." Tr. of 12/3/06 Hrg. at 4, 9, 11. The trial judge therefore denied Wolford's request for an additional continuance of the trial, but nonetheless offered her the opportunity to represent herself at trial, with appointed trial counsel to serve as standby counsel. Alternatively, Wolford was permitted to retain new counsel provided that any such counsel would be prepared to commence trial the following day. In the circumstances, therefore, Wolford's second motion to continue the trial was essentially granted in part, as jury selection and further trial proceedings were continued an additional day.

■ It is well-settled that a petitioner's right to counsel of her own choosing is not absolute, and that "[a] request for change in counsel cannot be considered justifiable if it proceeds from a transparent plot to bring about delay." *United States v. Gallop,* 838 F.2d 105, 108 (4th Cir.1988) (citing *Morris v. Slappy,* 461 U.S. 1, 13, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983)). Here, given the trial judge's express observation that Wolford had engaged in delay tactics,[34] and given that the jury trial had already been delayed once on Wolford's first motion to continue, it simply cannot be said that the trial judge's denial of Wolford's second motion for a continuance amounted to an abuse of discretion.

In sum, then, Wolford's claim relating to the trial judge's denial of her second motion for a continuance of the trial is procedurally defaulted. But, even had it been proper to consider this defaulted claim in the instant collateral attack, the claim would nonetheless fail on the merits.

**B.**

Wolford next argues that trial counsel was constitutionally ineffective during the plea negotiation and pretrial proceedings. Put simply, Wolford contends that had she received competent legal advice from trial counsel in this instance, she would have accepted the plea offer extended by the government in June or August 2006 rather than proceed to trial, thus subjecting her to a significantly lower guidelines range of imprisonment and possibly a lesser custody sentence. Unlike Wolford's first claim, this ineffective assistance of counsel claim has considerable force.

■ It is well-settled that "[a] criminal defendant has a right to effective assistance of counsel in deciding whether to accept or reject a proposed plea agreement." *Toro v. Fairman,* 940 F.2d 1065, 1067 (7th Cir.1991) (citations omitted). Indeed, "the decision whether to plead guilty or contest a criminal charge is ordinarily the most important single decision in a criminal case ... [and] counsel may and must give the client the benefit of counsel's professional advice on this crucial deci-

---

**34.** The presiding trial judge, of course, is in the best position to assess the credibility of a petitioner who appears in open court and seeks multiple continuances of the scheduled trial.

sion." *United States v. Gordon,* 156 F.3d 376, 380 (2d Cir.1998) (citations and internal quotation marks omitted).

Where, as here, a petitioner raises an ineffective assistance of counsel claim arising out of the plea negotiation · process, "the first half of the *Strickland v. Washington* test is nothing more than a restatement of the standard of attorney competence" applicable to all felony cases. *Hill v. Lockhart,* 474 U.S. 52, 58, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985). And, in this regard, it is well-settled that the *Strickland* attorney competence inquiry is measured in accordance with "prevailing professional norms," which require, *inter alia,* "that an attorney 'inform[ ] himself ... fully on the facts and the law'" applicable to his client's case. *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052. To be sure, the Fourth Circuit has recognized that "[w]e cannot expect criminal defense lawyers to be seers, but we must demand that they at least apprise themselves of the applicable law and provide their clients with a reasonably accurate description of it." *Ostrander v. Green,* 46 F.3d 347, 355 (4th Cir. 1995), *overruled on other grounds, O'Dell v. Netherland,* 95 F.3d 1214 (4th Cir.1996).

Here, the record reflects that trial counsel's advice to Wolford during the plea negotiation and pretrial proceedings was insufficient to enable Wolford to make a knowing and voluntary decision whether to accept the government's plea offer rather than proceed to trial. Several aspects of trial counsel's advice—or, in some cases, lack of advice—support this conclusion.

 First, the record reflects that Wolford had essentially no viable defenses to the charged conduct, particularly the conspiracy charge, yet trial counsel never clearly advised Wolford of this fact during the plea negotiation process. Instead, the record reflects that trial counsel—although not intentionally—misled Wolford into believing that she had some possibility of prevailing at trial on the basis of several non-viable defenses, including specifically the non-existent "household distribution" or "family member" defense. Competent counsel would have recognized that Wolford had no viable defenses to the charged conduct and would have clearly advised Wolford as such during the plea negotiation process. Competent counsel likewise would have known that it is *not* a defense to a federal drug conspiracy charge that a defendant distributed drugs only to family or household members; indeed, trial counsel now readily acknowledges that he has not "been able to find" any support for such a defense. Tr. at 215. Yet, given trial counsel's pretrial advice to Wolford regarding this so-called "family member defense," including specifically the fact that trial counsel "put a lot of faith in it ... personally" and communicated his personal belief in this purported defense to Wolford prior to trial,[35] Wolford continued to reject the government's plea offers and instead proceeded to trial with the erroneous belief (i) that "it was legal to distribute prescription drugs to family and household members but not for money," (ii) "that if ... the people lived in the house that it was okay to give them pills as long as they were family members," and (iii) "that in order to be guilty, the government had to prove that [she] sold people drugs for profit." Pet. Aff. ¶ 6; Tr. at 60. Simply put, allowing Wolford to proceed throughout these proceedings with the erroneous belief that she had one or more viable defenses to the charged conduct, including specifically the non-existent "family member defense," was objectively unreasonable under the *Strickland* ineffective assistance

**35.** Tr. at 215.

of counsel standard. *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052.

■ Also objectively unreasonable was trial counsel's failure to advise Wolford about the impact and significance of relevant conduct in determining a defendant's ultimate sentencing guidelines range. In this regard, the record reflects that trial counsel never advised Wolford, as competent counsel would have, that a conviction at trial on the conspiracy charge alone would render her accountable for all of the "reasonably foreseeable" controlled substances that she and her co-conspirators distributed and possessed with the intent to distribute during the entire course of the conspiracy. *See* U.S.S.G. § 1B1.3. Nor does the record reflect that trial counsel ever advised Wolford that the applicable drug quantity for guidelines-related purposes would ultimately be determined by the sentencing judge, rather than by the jury, using only a preponderance of the evidence standard. *See Brooks,* 524 F.3d at 560 n. 20 (noting that "a sentencing court is free to calculate the advisory Guidelines range using facts that it finds by a preponderance of the evidence, including individualized drug quantities"). Put simply, therefore, it does not appear in this record that trial counsel ever advised Wolford that if she were convicted on the conspiracy charge at trial—a result that was essentially unavoidable in light of the overwhelming evidence of Wolford's guilt and the lack of any viable defenses to the charged conspiracy[36]—an acquittal on some or even all of the additional substantive drug charges would not ultimately affect her guidelines calculations in any re-

spect. *See* Pet. Aff. ¶ 11 (where Wolford states that trial counsel "never explained to [her] that as long as [she] was found guilty of one charge, the court could sentence [her] based on conduct [she] was acquitted of or any other conduct not alleged but proven at [her] sentencing by a preponderance of the evidence"). Moreover, the record does not reflect that trial counsel clearly advised Wolford that if she were convicted on the conspiracy charge at trial, the applicable drug weight for sentencing-related purposes could be calculated, as the government argued throughout the plea negotiation process, by totaling all of the controlled substances obtained by Wolford and her co-conspirators during the course of the conspiracy, including amounts obtained for personal use by the conspirators. *See Williams,* 1997 WL 123138, at *1.[37]

In sum, therefore, the record reflects that trial counsel's incorrect and incomplete legal advice to Wolford during the plea negotiation process was objectively unreasonable. *See Strickland,* 466 U.S. at 688, 104 S.Ct. 2052 (noting that defense counsel must " 'inform[ ] himself ... fully on the facts and the law' " applicable to his client's case). This incorrect and incomplete advice, in turn, prevented Wolford from making a knowing and voluntary decision whether to accept the government's plea offer rather than proceed to trial in this instance. Of course, it is important to note that the Sixth Amendment does not require defense counsel to be 100% correct or perfect in advising his or her client in the course of a criminal prosecution, as

---

**36.** Indeed, trial counsel conceded in the course of the October 9, 2009 evidentiary hearing that "the more [he] look[s] at it," "[he] never really thought [he] could beat the conspiracy" charge at trial. Tr. at 216.

**37.** Regardless of whether trial counsel personally disagreed with this particular method

of calculation, it was nonetheless his duty to advise Wolford fully on the law in this regard rather than, as he put it, simply to proceed to trial in hopes of "eat[ing] away" at the applicable drug quantity by "showing that [Wolford] wasn't responsible for this—this offense in as large amount as the Government thought she was." Tr. at 216.

such a standard would sometimes be impossible to meet. Indeed, defense counsel, on occasion, must make predictions in areas of unsettled law or perhaps make new arguments in areas of settled law, and in both of these instances, defense counsel will likely be unable to be 100% accurate. Yet where, as here, the legal advice at issue involves areas of settled law and no reasonable arguments could be made to alter these settled rules, defense counsel clearly has an affirmative duty to advise his or her client correctly in all material respects. And significantly, the incorrect and incomplete legal advice trial counsel provided Wolford in this instance was not only material, it was indeed central to Wolford's decision whether to accept the government's plea offer or instead proceed to trial. Wolford has thus met the first prong of the *Strickland/Hill* analysis with respect to her claim that trial counsel rendered ineffective assistance during the plea negotiation and pretrial proceedings.

 But this, of course, does not end the analysis, for Wolford must also establish that she was prejudiced by counsel's objectively unreasonable performance. In the plea context, the prejudice prong of the analysis "focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process." *Hill,* 474 U.S. at 59, 106 S.Ct. 366. Thus, a petitioner can satisfy the prejudice requirement by establishing, for example, "that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id.* Conversely, a petitioner can establish the requisite prejudice by demonstrating that, but for counsel's deficient performance, there is a reasonable probability that he would have entered into a plea agreement rather than proceed to trial. *See, e.g. Griffin v. United States,* 330 F.3d 733, 736 (6th Cir. 2003) (recognizing that "[t]he second element of the *Strickland* test in the plea offer context is that there is a reasonable probability the petitioner would have pleaded guilty given competent advice").[38] For purposes of this analysis, "a reasonable probability" is defined as "a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.

The Fourth Circuit has recognized that "[a]lthough [the *Hill* prejudice analysis] focuses the inquiry on the subjective question, the answer to that question [in the plea context] must be reached through an objective analysis." *Hooper v. Garraghty,* 845 F.2d 471, 475 (4th Cir.1988); see also *Ostrander,* 46 F.3d at 355 n. 12 (noting that "[o]bjective analysis of the prejudice prong is probably the only workable means of applying *Hill* "). Thus, to meet the *Strickland/Hill* prejudice requirement, a petitioner "must establish through objective evidence that there is a reasonable probability that, but for counsel's advice, he would have accepted the plea." *Toro,* 940 F.2d at 1068; *see also Paters v. United States,* 159 F.3d 1043, 1047 (7th Cir. 1998) (stating that "[i]n order to establish prejudice, [petitioner] must show (1) through objective evidence that (2) there is a reasonable probability that, but for counsel's inadequate performance, he would have accepted the government's [plea] offer"); *compare Griffin,* 330 F.3d at 737 (stating that "[a]lthough some circuits have

---

**38.** Indeed, as one court sensibly noted,

[i]f counsel is deficient in advising a client of the consequences of going to trial as opposed to accepting a plea offer and the client decides to go to trial, the client has an ineffective assistance claim if he can

demonstrate that he would have pleaded guilty if he had been represented by competent counsel.

*United States v. Ramsey,* 323 F.Supp.2d 27, 42 (D.D.C.2004) (citing *Hill,* 474 U.S. at 56, 106 S.Ct. 366).

held that a defendant must support his own assertion that he would have accepted the offer with additional objective evidence, we in this circuit have declined to adopt such a requirement") (citations omitted).

■ Objective factors relevant to the prejudice analysis include, for example, "the potential strength of the [government's] case ..., as a reasonable defendant would surely take [that] into account in deciding whether to accept a plea offer or proceed to trial." *Ostrander,* 46 F.3d at 356. A petitioner's repeated protestations of innocence throughout trial, if applicable, are also relevant to the prejudice analysis in the plea context. *See Smith v. United States,* 348 F.3d 545, 552 (6th Cir.2003) (recognizing that "[p]rotestations of innocence throughout trial are properly a factor in the trial court's analysis, however they do not, by themselves, justify summary denial of relief without an evidentiary hearing") (citing *Cullen v. United States,* 194 F.3d 401, 404–07 (2d Cir.1999)); *see also Griffin,* 330 F.3d at 738 (recognizing that a petitioner's repeated declarations of innocence throughout trial do not, by themselves, prove that the petitioner would not have accepted a guilty plea). Additionally—and most significant here— the disparity between the government's plea offer and a petitioner's sentencing exposure if convicted at trial has been recognized as "strong [objective] evidence of a reasonable probability that a properly

advised defendant would have accepted a guilty plea offer, [even] despite earlier protestations of innocence." *Smith,* 348 F.3d at 552.[39]

■ Here, there is ample objective evidence establishing a reasonable probability that Wolford would have accepted the government's June or August 2006 plea offer had she received complete and accurate advice from trial counsel. To be sure, the government's evidence of guilt against Wolford was overwhelming. *See Ostrander,* 46 F.3d at 356 (recognizing that "the potential strength of the [government's] case" is an objective factor relevant to the prejudice analysis). Moreover, Wolford never disputed that she had distributed *some* quantity of controlled substances during the relevant period and she clearly wanted to reach a plea agreement with the government in this case. Pet. Aff. ¶ 15; Tr. at 41, 47–48, 82, 86. But here, the most compelling objective evidence in the prejudice analysis is the significant—indeed striking—disparity between the government's plea offer and Wolford's sentencing exposure were she to be convicted at trial. *See Smith,* 348 F.3d at 552 (noting that a disparity in a petitioner's sentencing exposure is "strong [objective] evidence of a reasonable probability that a properly advised defendant would have accepted a guilty plea offer").[40] Specifically, had Wolford accepted the government's plea offer, her base offense level under the guidelines, assuming the trial judge agreed

**39.** *See also Griffin,* 330 F.3d at 737 (recognizing that "it has been held ... that a substantial disparity between the penalty offered by the prosecution and the punishment called for by the indictment is sufficient to establish a reasonable probability that a properly informed and advised defendant would have accepted the prosecution's offer").

**40.** *See also United States v. Gordon,* 156 F.3d 376, 377–81 (2d Cir.1998) (holding that the disparity between the ten-year sentence rec-

ommended in the plea agreement and the seventeen-and-a-half year sentence imposed following trial was objective evidence that a plea would have been accepted given competent legal advice); *United States v. Day,* 969 F.2d 39 (3d Cir.1992) (finding ineffective assistance of counsel when trial counsel mistakenly described the penalties at trial as ten years rather than the twenty-two years defendant received at sentencing, and where a plea offer of five years had been made prior to trial).

with the government's recommended drug quantity, would have been 28 to 30. This, of course, is 6 to 8 levels lower than the base drug offense level of 36 assigned following Wolford's trial convictions. Additionally, had Wolford accepted the government's plea offer, she likely would have received a three-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1. She also would have avoided a two-level enhancement pursuant to U.S.S.G. § 2D1.2(a)(1) for engaging in criminal conduct in a protected area, and a two-level role in the offense enhancement pursuant to U.S.S.G. § 3B1.1(c), as the government agreed not to pursue these particular enhancements under the terms of the June and August 2006 plea offers. Finally, although it was not reasonably foreseeable that Wolford would testify untruthfully at trial, it is nonetheless important to note for purposes of this analysis that Wolford would not have received an additional two-level enhancement for obstruction of justice, pursuant to U.S.S.G. § 3C1.1, had she accepted the government's plea offer. Thus, the record reflects that Wolford's total offense level could have been reduced by as many as 17 levels (6 to 8 for drug quantity, 3 for acceptance, 2 for protected area, 2 for role and 2 for obstruction) had she accepted the

government's plea offer rather than proceed to trial in this instance. Combined with Wolford's criminal history of II, this reduced offense level could have translated into a guidelines range of imprisonment as low as 63 to 78 months—remarkably lower than the 360 months to life range calculated following Wolford's trial.[41]

In sum, then, Wolford has met the two-part *Strickland/Hill* ineffective assistance of counsel standard by establishing (i) that trial counsel's advice during the plea negotiation process was objectively unreasonable and (ii) that there is a reasonable probability, based on ample objective evidence,[42] that Wolford would have accepted the government's plea offer rather than proceed to trial had she received competent advice from trial counsel during the plea negotiation process. *See Griffin,* 330 F.3d at 736 (recognizing that "[t]he second element of the *Strickland* test in the plea offer context is that there is a reasonable probability the petitioner would have pleaded guilty given competent advice"). In other words, had trial counsel rendered clear and accurate advice to Wolford during the plea negotiation process—including specifically (i) that she had no viable defenses to the charged conduct, (ii) that a conviction on the conspiracy charge was inevitable were she to proceed to trial, and

---

41. While it is true that Wolford received a significant downward variance following her jury convictions, there simply is no way of knowing what sentence the trial judge would have imposed had Wolford accepted the government's June or August 2006 plea offer rather than proceed to trial in this instance.

42. It is important to note that the conclusion reached here is not altered by the fact that Wolford did not testify definitively that she would have accepted the government's plea offer had trial counsel's advice to her during the plea negotiation process differed in any respect. Rather, a review of analogous cases from this and other circuits confirms that a petitioner's own self-serving statements are typically insufficient to satisfy the prejudice

prong of the *Strickland/Hill* analysis in the plea context. *See, e.g., Toro,* 940 F.2d at 1068 (concluding that petitioner's statement that he "would have been insane not to accept the plea agreement for the minimum sentence" was "self-serving and alone, insufficient to establish that, but for counsel's advice, there is a reasonable probability that he would have accepted the plea"). Nor is Wolford's unrealistic desire to avoid serving any period of incarceration were she to accept the government's plea offer a dispositive factor in the prejudice analysis, inasmuch as it is reasonable to conclude that Wolford's view in this regard would have been altered or influenced by competent and clear advice from trial counsel during the plea negotiation process.

(iii) that an acquittal on any additional substantive distribution charges would likely not affect the applicable drug quantity or sentencing guidelines calculations in any respect once relevant conduct was determined by the trial judge using a preponderance of the evidence standard—there is a reasonable probability that Wolford would have accepted the government's June or August 2006 plea offer rather than proceed to trial in this instance. Wolford's § 2255 motion must therefore be granted as to this particular claim.

### C.

Wolford next contends that trial counsel's preparation for the jury trial was constitutionally deficient. A careful review of the record does not support Wolford's claim on this issue. Indeed, given the overwhelming evidence of guilt presented by the government at trial, Wolford is simply unable to establish that she ultimately suffered any prejudice owing to trial counsel's pretrial preparation or performance during the course of the jury trial in this instance.

With respect to the specific allegations raised in this claim, Wolford first contends that trial counsel (i) "never interviewed any of the witnesses [she] alerted him to" and (ii) "never even spoke to [her] treating physicians who had been prescribing most of the prescription drugs [she] had been using and had been accused of distributing." Pet. Aff. ¶ 7. On this issue, the record reflects that approximately one month prior to the scheduled trial date, Wolford provided trial counsel with a list of 97 individuals that she believed might provide relevant testimony at trial. Tr. at 54–55. Many of these individuals were treating physicians who had prescribed the controlled substances Wolford was accused of conspiring to distribute, while others

were individuals who knew Wolford personally and could testify as to her drug addiction and rehabilitation. Tr. at 55–56. Although trial counsel contacted some of these identified individuals—indeed some were later called as defense witnesses in the course of the trial—trial counsel did not contact or interview the majority of the individuals included on Wolford's lengthy list because, as he put it, he "didn't believe at the time that those witnesses would have changed any of the facts ... or that they would testify that [Wolford] didn't distribute drugs." Tr. at 76–79, 189–90. Counsel's decision in this regard was not objectively unreasonable, particularly given that the government did not dispute Wolford's drug addiction or the fact that some of the controlled substances at issue had been obtained through the use of physician-issued medical prescriptions. Moreover, there was ample trial testimony concerning Wolford's drug addiction and rehabilitation and any additional testimony on those issues would merely have been cumulative.

Wolford next contends that trial counsel did not adequately prepare her for her trial testimony, specifically alleging that trial counsel (i) "never advised [her] on whether [she] should testify," (ii) "never prepared [her] to testify," (iii) "never went through the types of questions he would ask [her]" and (iv) "never prepared [her] for cross-examination." Pet. Aff. ¶ 5. On this issue, trial counsel testified credibly (i) that he discussed with Wolford "the pros and cons of testifying and not testifying," (ii) that he "talked with her about general themes [and] ... issues that [he] wanted to bring out with her testimony," (iii) that he advised her "that the jury needed to hear from her what was going on in her life as to why these things happened," and finally, (iv) that he advised her "[t]hat she had a right not to testify." Tr. at 190–91.[43]

---

**43.** The trial transcript also reflects that prior to Wolford being called as a defense witness,

Yet, trial counsel concedes that he did not discuss with Wolford any of the specific questions that he planned to ask her during the course of her direct examination;[44] nor does the record reflect that trial counsel ever prepared Wolford for cross-examination in any respect. Tr. at 191.

The Fourth Circuit has made clear that "[t]horough preparation demands that an attorney interview and prepare witnesses before they testify," specifically recognizing that "[n]o competent lawyer would call a witness without appropriate and thorough pre-trial interviews and discussion." *United States v. Rhynes*, 218 F.3d 310, 319 (4th Cir.2000) (noting that "more than one lawyer has been punished, found ineffective, or even disbarred for incompetent representation that included failure to prepare or interview witnesses") (citations omitted). And, of course, counsel's pre-trial preparation of a witness is even more crucial where, as here, the testifying witness at issue is the defendant on trial.

Here, the record reflects that trial counsel's preparation of Wolford for her trial testimony was not sufficiently "appropriate and thorough," and thus fell short of the required standard. *Id.* Put differently, trial counsel's failure to discuss with Wolford any of the specific questions that he planned to ask her during the course of her testimony, combined with his failure to prepare her for cross-examination in any respect, was objectively unreasonable. *See Strickland,* 466 U.S. at 688, 104 S.Ct. 2052. In the circumstances, it is not at all surprising that Wolford wavered in her trial testimony and eventually admitted on cross-examination that she had distributed controlled substances to other individuals, as alleged in the charged conspiracy. Moreover, the fact that trial counsel was admittedly "surprised" by Wolford's testimony in this regard further supports the conclusion that she was not adequately prepared by trial counsel prior to taking the stand at trial.[45] Tr. at 208.

trial counsel confirmed to the trial judge, outside the presence of the jury, that he had discussed with Wolford the pros and cons of her testifying versus not testifying and that it was Wolford's desire to take the stand in her own defense. Trial Tr. at 775. At the same time, Wolford likewise confirmed to the trial judge that she wished to testify on her own behalf. *Id.*

44. According to trial counsel, he did not do so because he "thought at the time that if she had a script and rote questions and a rote memorization, that it would appear that she was less honest with the jury instead of being truthful." Tr. at 191.

45. The following exchange between trial counsel and Wolford's current retained counsel is particularly telling on this issue:

Q Did you know—at what point did you know that if you called Ms. Wolford to the stand and she told what she did, even as minimizing it as she might have been, that she was going to admit distributing some of the drugs that she was given to other people, not household members?

A I wasn't—I don't know when I came to that realization. I don't know if I ever came to that realization until she testified. I—I—

Q Is that because you didn't talk to her about what she was going to say to that question?

A It may have been.

Q So you went to trial on a conspiracy count and knowing that you might call your client to the stand, that would be her choice, and that if she did take the stand you didn't know whether she was going to admit facts that would make her, in the eyes of the law, guilty of the conspiracy or not?

A As I had understood the facts, I did not believe that she would say what she ended up saying—in her testimony. I was surprised at her testimony, yes.

Q You're not claiming that her admission that she distributed drugs to other people was not true. You don't believe that to be untrue.

A No, I don't.

Q Okay. So—and you knew that the discovery showed that other people said that she had distributed it; correct—

A Yes.

Tr. at 207–08.

■ Although the record supports the conclusion that trial counsel did not adequately prepare Wolford for her trial testimony, her claim on this issue nonetheless fails on the prejudice prong of the *Strickland* analysis. Indeed, given the overwhelming amount of testimony and evidence of guilt presented against Wolford in the course of the jury trial by, *inter alia,* her co-conspirators, suppliers, customers, law enforcement officers, and a confidential informant, it cannot reasonably be argued that the result of the trial would have been different had Wolford's trial testimony differed in any respect or had she elected not to take the stand in her own defense. In other words, Wolford is unable to show "that there is a reasonable probability that, but for counsel's unprofessional errors [concerning his preparation of Wolford for her trial testimony], the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.[46]

In fact, all of the allegations raised by Wolford concerning trial counsel's preparation for trial in this instance—even assuming trial counsel's performance was objectively unreasonable in any additional respect—likewise fail on the prejudice prong of the *Strickland* analysis. Indeed, no additional amount of preparation, investigation or legal research on the part of

trial counsel would have altered the fact that the evidence of guilt presented against Wolford in the course of the jury trial was overwhelming. Nor would any additional research or trial preparation have resulted in trial counsel's discovery of a viable defense to the charged conduct—there clearly was none.[47] In other words, *any* jury trial in this case, regardless of counsel's pretrial preparation or performance during the course of the trial, almost certainly would have resulted in Wolford's conviction at least on the conspiracy count, which, of course, is the driving force behind the sentencing guidelines calculations.[48] In the circumstances, therefore, because Wolford is unable to satisfy the two-prong *Strickland* standard, her § 2255 motion must be denied insofar as she claims that trial counsel's preparation for trial was constitutionally deficient.

**D.**

Wolford next contends that trial counsel was ineffective in failing to object to an allegedly prejudicial instruction given by the trial judge to the jury in the course of the trial. The facts relevant to this claim are few and undisputed. Specifically, the trial record reflects that one of the government's witnesses—a long-time neighbor of Wolford—testified that he once overhead Wolford's son (Chris) and Wolford's daughter (Mandy) engaged in a loud "fi-

---

**46.** Although Wolford may not have received the two-point obstruction enhancement pursuant to U.S.S.G. § 3C1.1 had her trial testimony differed in some respect, or had she not testified in her own defense, application of this enhancement, by itself, is insufficient to constitute the requisite *Strickland* prejudice given that the enhancement was based on Wolford's own obstructive conduct, namely her untruthful trial testimony. Moreover, the record reflects that trial counsel specifically instructed Wolford to tell the truth during the course of her trial testimony. Tr. at 208–09.

**47.** Wolford's allegations pertaining to trial counsel's alleged failure to perform sufficient

legal research with respect to the elements of the charged offenses and any viable defenses thereto—as well as trial counsel's alleged failure to advise Wolford accurately in this regard—are more appropriately addressed in connection with Wolford's claim that counsel rendered ineffective assistance in the course of the plea negotiation proceedings. *See supra* Part II(B).

**48.** It is important to note that Wolford was acquitted on seven of the ten counts with which she was charged in the superseding indictment based, at least in part, on trial counsel's preparation and performance in the course of the jury trial.

nancial argument" with McCauley in Wolford's front yard, during the course of which "Mandy screamed at the top of her lungs that Chris was a coke dealer." Trial Tr. at 376. Over trial counsel's hearsay objection, the trial judge allowed the jury to hear the neighbor's testimony in this regard pursuant to Rule 801(d)(2), Fed. R. Evid., governing statements made by a co-conspirator in furtherance of a conspiracy.[49] Before doing so, however, the trial judge provided a brief oral instruction to the jury, as follows:

> Let me explain to the jury, I know some of the rulings I haven't said much, but I did say something about hearsay. Hearsay cannot come in unless it's conversations with the defendant, but you're going to hear later on, and I don't like to—some of the rulings seem inconsistent, but they're not. There's an exception to the hearsay [rule] if it's part of a conspiracy, which you have to prove the conspiracy and everything else, so I'm allowing this conversation. If it is part of the conspiracy and in furtherance, hearsay can come in. That's an exception to the hearsay rule. So it may sound inconsistent. I'm saying, "No hearsay," but there are exceptions. If certain things are proven and I'll explain them to you in my charge, then it comes in.

Trial Tr. at 375. Trial counsel did not object to the trial judge's instruction to the jury on this issue; nor did appellate counsel raise the issue on direct appeal. Yet now, in the instant collateral attack, Wolford argues that the trial judge, in giving this oral instruction, improperly informed the jury that the alleged conspiracy had already been established. Wolford thus contends that trial counsel was ineffective in failing to object to the trial judge's instruction in the course of the trial and that appellate counsel was then ineffective in failing to raise the issue on direct appeal. Wolford's argument in this regard is flawed in several respects.

First, a careful reading of the instruction at issue makes clear that the trial judge did not, as Wolford contends, definitively advise the jury that the alleged conspiracy had already been proven. Instead, the trial judge merely provided the jury a general instruction concerning the well-established exception to the hearsay rule for co-conspirator statements made in furtherance of a conspiracy. Thus, while the trial judge noted that he was "allowing" the neighbor's testimony to be heard by the jury in light of this exception, he nonetheless instructed the jury that "certain things" first needed to be proven by the government to establish the existence of a conspiracy. Trial Tr. at 375 (where trial judge stated "[t]here's an exception to the hearsay [rule] if it's part of a conspiracy, which you have to prove the conspiracy and everything else, so I'm allowing this conversation").[50] The trial judge further noted that these "certain things" that needed to be proven—namely, the elements of the conspiracy charge, including the existence of the alleged conspiracy—would be explained to the jury more fully in the final instructions. Trial Tr. at 375 (where trial judge stated "[i]f certain

**49.** *See* Rule 801(d)(2), Fed. R. Evid. (providing that "[a] statement is not hearsay if ... the statement is offered against a party and is ... a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy").

**50.** *See United States v. Peters,* 791 F.2d 1270, 1286 (7th Cir.1986) (where the trial judge's mid-trial instruction to the jury concerning the co-conspirator exception to the hearsay rule was found not to be "a *de facto* pronouncement to the jury that the government had convinced the judge that a conspiracy existed") (superseded on other grounds, as stated in *United States v. Guerrero,* 894 F.2d 261, 267 (7th Cir.1990)).

things are proven and I'll explain them to you in my charge, then it [the statement made by a co-conspirator in furtherance of a conspiracy] comes in"). And indeed, the trial record reflects that the trial judge, in the course of the final jury instructions, properly instructed the jury with respect to each and every element of the charged conspiracy, reminding the jury specifically that unless they unanimously found that the government had proven all of the required elements of the charged conspiracy beyond a reasonable doubt, they were required to acquit Wolford on that offense. Trial Tr. at 950–53.

Simply put, therefore, because the trial judge did not definitively instruct the jury that the charged conspiracy had already been established, as Wolford contends, trial counsel was not objectively unreasonable in failing to object to the disputed instruction in the course of the trial; nor was appellate counsel objectively unreasonable in failing to raise the issue on direct appeal. *See Strickland,* 466 U.S. at 688, 104 S.Ct. 2052. Nor did Wolford suffer any prejudice as a result of trial and appellate counsel's failure to object to the alleged prejudicial statement in the course of the trial or on direct appeal given (i) the overwhelming evidence of guilt presented against Wolford in this case, particularly on the conspiracy charge, and (ii) the fact that the argument would have been rejected on direct appeal for the reasons already stated.[51] In other words, Wolford has failed to establish "that there is a reasonable probability that, but for counsel's [alleged] unprofessional errors, the result of the proceeding would have been different"

**51.** Indeed, Wolford has failed to identify any case where a similar statement made by a trial judge in the course of a jury trial warranted a reversal on direct appeal, let alone relief on collateral attack.

**52.** A review of the PSIR reveals that Wolford was assessed one criminal history point for

in any respect. *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. For this reason, Wolford's claim on this issue must be denied.

**E.**

Finally, Wolford argues that trial counsel was ineffective in failing to object to the assessment of three points in her criminal history calculation based on a March 24, 2005 conviction in the General District Court of Prince William County for providing false identification to law enforcement authorities in the course of a traffic stop, a conviction for which she received 12 months in jail, suspended, and 12 months of probation with 50 hours of community service.[52] Specifically, Wolford contends that trial counsel should have argued that this prior conviction constituted relevant conduct to the charged offenses and thus should not have resulted in the assessment of any criminal history points. In support thereof, Wolford notes, *inter alia,* that the facts underlying her false identification conviction—including the recovery of drugs from her vehicle in the course of her arrest on that prior occasion—were presented during the course of the instant jury trial.

Wolford's claim in this regard fails on both prongs of the *Strickland* analysis. First, the record reflects—and Wolford concedes—that trial counsel "arguably hinted at or made this same argument during [her] sentencing" proceeding. Pet. Br. at 28, n. 19. Indeed, the record reflects that trial counsel objected to Wolford's criminal history calculation in the course of the sentencing proceeding, specifically stating the following:

this previous conviction pursuant to U.S.S.G. § 4A1.1(c), as well as two additional points pursuant to U.S.S.G. § 4A1.1(d) for committing the instant offense while on probation in connection with that previous conviction. Wolford was thus assessed a total of three criminal history points, placing her in criminal history category II.

The first criminal conviction she has is this false ID charge that was talked about at trial. She had nothing on her criminal record prior to that date. The guidelines use the fact that she was on probation for that charge during the conspiracy to add two more points in the criminal history calculation, which puts you at a level 3, which is a criminal history category II. I believe that's inappropriate for two reasons. One, it's almost a subset of the conspiracy that this crime was brought up. It was the subject of evidence at trial. It was used 'at trial very extensively. It was used at trial to show the character of the defendant ... Also, Your Honor, it's bookended by the conspiracy. Before the traffic stop and after the traffic stop, according to the government, this conspiracy was ongoing.

Sent. Tr. at 23–24. Significantly, the criminal history-related argument raised by trial counsel in the course of the sentencing proceeding, although phrased differently, is essentially identical to the argument Wolford raises in the instant collateral at-

tack.[53] Because of this, Wolford is unable to establish that trial counsel's performance was objectively unreasonable in the alleged respect.

 Wolford's argument likewise fails on the *Strickland* prejudice prong of the analysis. To be sure, the record reflects that the trial judge considered and rejected the argument raised by Wolford in the instant collateral attack, concluding instead that the criminal history calculation set forth in the PSIR was correct in all respects. Indeed, Wolford's prior conviction for false identification—an offense clearly unrelated to the instant drug charges—was neither relevant conduct nor "part of the instant offense" for purposes of Wolford's criminal history calculation. *See* U.S.S.G. § 4A1.2(a)(1). Accordingly, as Wolford is unable to meet either prong of the *Strickland* analysis, her claim that trial counsel was ineffective in failing to object to her criminal history calculation at sentencing must be denied.[54]

### III.

In the end, this case presents a very unusual set of circumstances. First, there

---

**53.** The government, for its part, stated the following concerning this issue in the course of the sentencing hearing:

As to the criminal history category, moving down from II to I, the government also rejects or opposes that. To be clear, the identity theft charge is not a drug charge. It's not as if the government absorbed that conduct in its case. To the extent there was testimony, yes, that's correct. We did not absorb it in the context of relying on the quantities [of drugs] that were found during those—during that particular traffic stop.

Sent. Tr. at 51. The government's response in this regard—referring specifically to the fact that testimony was presented in the course of the trial concerning Wolford's prior false identification conviction—further supports the conclusion that the "relevant conduct" argument raised by Wolford in the instant collateral attack was, in essence, raised

by trial counsel in the course of the sentencing proceeding.

**54.** In addition to the argument pertaining to her criminal history calculation, Wolford also contends that a lesser custody sentence was warranted in light of the sentences imposed on her co-conspirators and other defendants who committed similar crimes in this jurisdiction. Additionally, Wolford suggests that she might have received a lesser sentence had her sentencing occurred after the Supreme Court's issuance of several recent sentencing-related cases. Simply put, these particular arguments are not appropriately raised in a § 2255 collateral attack, as they do not involve a lack of jurisdiction by the sentencing court, a constitutional error, or a legal error so grave as to constitute a "fundamental defect which inherently results in a complete miscarriage of justice." *Addonizio*, 442 U.S. at 185, 99 S.Ct. 2235.

is no doubt, given the overwhelming evidence of guilt presented at trial and Wolford's own admission, that Wolford is guilty of the offenses for which she was convicted. There also is no doubt that Wolford ultimately received a variant sentence well below the applicable guidelines range of imprisonment. It is likewise apparent that trial counsel was well-meaning and devoted a considerable amount of time to Wolford's case during the course of these proceedings. But despite these factors, it is nonetheless clear from the record that Wolford, based on the incorrect and incomplete advice that she received from trial counsel, (i) likely believed that she had one or more viable defenses to the charged conduct when, in fact, she had no such defenses, and (ii) was not aware of the probable guidelines calculations, including specifically those pertaining to the applicable drug quantity, were she to proceed to trial and be convicted rather than accept the government's plea offer. And significantly, there is a reasonable probability based on ample objective evidence, including specifically the significant disparity between the government's plea offer and the possible sentencing exposure following a trial conviction, that Wolford would have accepted the government's June or August 2006 plea offer rather than proceed to trial had she received competent advice from trial counsel during the plea negotiation process. *See Hill,* 474 U.S. at 59, 106 S.Ct. 366; *Griffin,* 330 F.3d at 736; *Ostrander,* 46 F.3d at 356. Given this, and for the foregoing reasons, Wolford's motion to vacate, set aside or correct her sentence, pursuant to 28 U.S.C. § 2255, must be granted with respect to her claim that trial counsel was ineffective during the plea negotiation process, but denied in all other respects. In the circumstances, therefore, Wolford's convictions and sentence must be vacated and the criminal prosecution reopened for fur-

ther proceedings consistent with this decision.

An appropriate order will issue.